In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-2503

IN RE:

MARVIN ROSS-TOUSEY AND DEBORAH TOUSEY,

*Debtors.*

MARVIN ROSS-TOUSEY AND DEBORAH TOUSEY,

*Debtors-Appellants,*

*v.*

WILLIAM T. NEARY,

*United States Trustee-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 07-C-65—**William C. Griesbach**, *Judge.*

ARGUED SEPTEMBER 5, 2008—DECIDED DECEMBER 17,2008

Before FLAUM, ROVNER, and WILLIAMS, *Circuit Judges*.

FLAUM, *Circuit Judge*. This appeal involves two juris-
dictional issues as well as interpretation of a provision of
the Bankruptcy Abuse Prevention and Consumer Protec-
tion Act of 2005 ("BAPCPA"). With regard to the bank-

ruptcy issue, this Court must resolve whether an above-median-income debtor who has no monthly vehicle loan or lease payment can claim a vehicle owner-ship expense deduction when calculating his disposable income. For the reasons explained below, we reverse the district court.

## I. Background

The debtors, Marvin Ross-Tousey and Deborah Tousey, filed a voluntary bankruptcy petition under chapter 7 of the Bankruptcy Code on August 18, 2006. The debtors live in Mattoon, Wisconsin and are each longstanding employees of the Mohican North Star Casino in Bowler, Wisconsin. In connection with their bankruptcy filing, the debtors reported household income above the ap-plicable state median income level.

BAPCPA subjects above-median-income debtors to a means test. The purpose of the means test is to dis-tinguish between debtors who can repay a portion of their debt and debtors who cannot. Under the means test, if a debtor has enough disposable income to pay his unsecured creditors at least $166.67[1] each month (that is, at least $10,000 over five years), the debtor usually should proceed under Chapter 13, which allows for a partial repayment of debt. If the debtor has $166.67 or more

---

[1] This dollar amount was increased under 11 U.S.C. § 104 effective April 1, 2007, but the increased amount does not apply in this case.

of disposable income under the means test, proceedings under Chapter 7—which allows for a complete discharge of debt—are considered presumptively abusive. *See* 11 U.S.C. § 707(b)(2)(A)(ii)(I).

The means test uses a formula to determine a debtor's ability to pay a portion of his debts. Essentially, the means test takes the debtor's current monthly income ("CMI") and reduces it by amounts corresponding to allowed monthly expenses set out in 11 U.S.C. § 707(b)(2)(A)(ii)-(iv). Pertinent to this appeal, under § 707(b)(2)(A)(ii)(I), debtors are permitted to deduct

> the debtor's applicable monthly expense amounts specified under the [Internal Revenue Service's] National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides . . . . Notwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts.

In performing their means test, the debtors here claimed the Internal Revenue Service ("IRS") Local Standard vehicle operating/public transportation allowance of $358 as well as the IRS Local Standard vehicle ownership allowance of $803 (for two vehicles). With these expenses subtracted from their CMI, the debtors' means test resulted in a finding that they had no disposable income. The debtors thus claimed that the presumption of abuse did not arise in their case and that they should be able to discharge their debts under Chapter 7.

On October 30, 2006, the United States Trustee ("UST") filed a motion to dismiss the debtors' case for abuse under section 707(b). Originally, the UST filed the motion under 11 U.S.C. § 707(b)(3)(B), asserting that the debtors' chapter 7 petition was abusive based upon the totality of the circumstances of the debtors' financial situation. A few days later—after the deadline set by § 704(b)(2) for UST motions to dismiss had passed—the UST supplemented its October 30 motion to dismiss, asserting that the case also merited a presumption of abuse under section 707(b)(2) because the debtors should not have taken the $803 Local Standard vehicle ownership deduction. On December 14, 2006, the bankruptcy court denied the UST's motion to dismiss, concluding that the totality of the circumstances did not establish abuse and that no presumption of abuse arose under section 707(b)(2) due to the vehicle ownership deduction. The bankruptcy court interpreted section 707(b)(2)(A)(ii)(I) to allow the debtors to take the vehicle ownership deduction even though the debtors had no monthly loans or leases on their vehicles.

The UST appealed and the district court reversed with regard to the section 707(b)(2) presumption of abuse, holding that the debtors could not claim the vehicle ownership deduction under section 707(b)(2)(A)(ii)(I) for vehicles the debtors owned outright. *See Neary v. Ross-Tousey (In re Ross-Tousey)*, 368 B.R. 762, 768 (E.D. Wis. 2007). (The district court did not address the UST's alternative argument, made under section 707(b)(3)(B), that the totality of the debtors' circumstances demonstrated abuse.) The district court therefore concluded that the presump-

tion of abuse arose in the debtors' case and remanded to the bankruptcy court for further proceedings to determine whether the debtors could rebut the presumption of abuse. *Id.* at 768-69.

The debtors appealed to this court. The UST moved to dismiss the appeal for lack of finality because the bankruptcy court had not yet determined whether the debtors had special circumstances sufficient to rebut the presumption. However, the debtors responded by stating that they had no special circumstances to raise on remand. Due to that concession, the UST agreed that this Court had jurisdiction in its reply brief. This Court denied the UST's motion to dismiss the appeal on February 15, 2008.

## II. Discussion

### A. Jurisdiction

Before turning to the merits of this appeal, the Court addresses two jurisdictional questions.

#### 1. Finality

The first jurisdictional question is whether there is a final order appropriate for appellate review in this case. This court has jurisdiction over "appeals from all final decisions, judgments, orders, and decrees entered" by a district court pursuant to its review of final decisions of a bankruptcy court. 28 U.S.C. § 158(d)(1). In other words, we have jurisdiction only "if both the bankruptcy court's order and the district court's order reviewing that original order are final decisions." *Zedan v. Habash*, 529

F.3d 398, 402 (7th Cir. 2008) (citing *In re Salem*, 465 F.3d 767, 771 (7th Cir. 2006)). There are thus two questions to address regarding finality in this case: (1) whether the bankruptcy court made a final decision when it denied the UST's motion to dismiss, and (2) whether the district court made a final decision when it reversed that determination.

With regard to the first question, normally a denial of a motion to dismiss is not an appealable final order. *See Hammond v. Kunard*, 148 F.3d 692, 695 (7th Cir. 1998). However, the Seventh Circuit has observed that finality in the bankruptcy context is considerably more flexible than in an ordinary civil appeal. *See Zedan*, 529 F.3d at 402. Finality does not require the termination of the entire bankruptcy proceeding; rather, an adjudication by the bankruptcy court "is definitive because it cannot be affected by the resolution of any other issue in the proceeding, and therefore no purpose would be served by postponing the appeal to the proceeding's conclusion." *In re Oakley*, 344 F.3d 709, 711 (7th Cir. 2003) (district court order that overturned bankruptcy court's order sustaining trustee's objection was final and appealable because "it definitely adjudicated the debtor's entitlement to a definite amount of money"). We have also held that "[a]n impending ministerial act does not make a decision non-final, for routine action on remand is unlikely to precipitate a later appeal." *In re A.G. Financial Service Center, Inc.*, 395 F.3d 410, 413 (citing *In re Lopez*, 116 F.3d 1191, 1192 (7th Cir. 1997)).

Here, the bankruptcy court denied the UST's motion to dismiss under sections 707(b)(2) and 707(b)(3)(B). This

decision resolved all of the contested issues on the merits and left only the distribution of estate assets to be completed. Because distribution of assets is a ministerial act, *see In re Official Comm. of Unsecured Creditors*, 943 F.2d 752 (7th Cir. 1991), the denial of the motion to dismiss was appropriate for appeal to the district court. *See also In re Wade*, 991 F.2d 402, 406 (7th Cir. 1993) ("A final order in a bankruptcy case, [sic] is one that resolves all contested issues on the merits and leaves only the distribution of the estate assets to be completed.").[2]

---

[2] We agree with the UST that a finding of jurisdiction in this case is not contrary to *In re Jartran, Inc.*, 886 F.2d 859 (7th Cir. 1989) or *In re Vlasek*, 325 F.3d 955 (7th Cir. 2003). In *Jartran*, we held not final an order denying a creditor's request for administrative priority and for dismissal of a second Chapter 11 petition because "a considerable number of potential disputes between Jartran and [the creditor] remain[ed] unresolved" and "resolution of these claims [would have been] more than a mere 'ministerial' matter." *Jartran*, 886 F.2d at 862. This case is distinguishable from *Jartran* because here there are no unresolved disputes. In *Vlasek*, this court found that the denial of a motion to dismiss a Chapter 11 case was not final. However, in that case, the parties apparently did not make a "compelling argument addressing why" the court should allow the denial to be appealed. *Vlasek*, 325 F.3d at 961. More importantly, in *Vlasek*, after denying the motion to dismiss, the bankruptcy court made orders of a non-ministerial nature approving the sale of property and approving of the estate's final accounting, undermining the contention that the denial of the motion to dismiss was appropriate to review as a final appealable order.

(continued...)

The district court's order was also final and appealable. As mentioned above, the district court reversed the bankruptcy court's denial of the motion to dismiss and remanded to the bankruptcy court for further proceedings. *See Ross-Tousey*, 368 B.R. at 768-69. Normally an order dismissing a case is appealable; the issue here is whether the district court's remand to the bankruptcy court made the district court's order "non-final." We have held that "even if the decision of the bankruptcy court is final, a decision by the district court which remands the case to the bankruptcy court for further proceedings is not final unless the contemplated further proceedings are of a purely ministerial character . . . ." *Lopez*, 116 F.3d at 1192; *see also In re Fox*, 762 F.2d 54, 55 (7th Cir. 1985) (a district court order remanding the case to the bankruptcy court may qualify as final if "all that remains to do on remand is a purely mechanical, computational, or in short 'ministerial' task, whose performance is unlikely either to generate a new appeal or to affect the issue that the disappointed party wants to raise on appeal from the order of remand"). Here, the district court reversed and remanded to the bankruptcy court, which had yet to

---

[2] (...continued)

*Id.* at 959-60. Finally, *Vlasek* was a quite unusual case, involving a *debtor* who moved to dismiss his bankruptcy petition over two years after it was filed, claiming—in an obvious attempt to avoid an imminent loss of property—that he was mentally incompetent at the time at the time of the bankruptcy filing and that his mother had signed the bankruptcy petition without his permission. *Id.* at 958.

determine whether the debtors had special circumstances sufficient to rebut the presumption of abuse under section 707(b)(2). However, the debtors appealed to this court. When the UST moved to dismiss the appeal due to the issue pending on remand, the debtors responded by stating that they had no special circumstances to raise on remand. Because debtors have stipulated that no special circumstances exist, it appears that the only task for the bankruptcy court on remand would be to allow the petitioners to convert their petition to a chapter 13 proceeding or dismiss the case. Since the decision between these options is within the debtors' discretion—not the bankruptcy court's—the remand contemplates only ministerial action. We therefore find that the district court's order was effectively a final order and therefore appropriate for appellate review. *See, e.g.*, *In re Cortez*, 457 F.3d 448, 452-53 (5th Cir. 2006) (where the bankruptcy court denied the UST's motion to dismiss under section 707(b) but the district court reversed the dismissal, the remand left only ministerial tasks to be completed and therefore constituted a final appealable order).

### 2. Untimeliness

The second jurisdictional issue is whether the UST's untimely raising of the section 707(b)(2) grounds for dismissal deprives this court of jurisdiction. Section 704(b)(2), as mentioned above, sets a deadline for filing motions to dismiss chapter 7 cases for presumed abuse under section 707(b)(2). *See* 11 U.S.C. § 704(b)(2). In this case, the UST timely filed its initial motion to dismiss on

October 30, 2006. The October 30 motion argued that the case should be dismissed because of the totality of the debtor's circumstances. The UST did not raise the section 707(b)(2) claim for presumed abuse until it supplemented its dismissal motion on November 2. The November 2 supplement referenced Fed. R. Civ. P. 15, which allows an amendment as a matter of course before a responsive pleading is filed, and allows such an amendment to relate back to the date of the original filing in certain circumstances. But, as the UST now concedes in briefing, Rule 15 did not apply to its motion to dismiss and was thus improperly invoked. *See* Fed. R. Bankr. P. 9014 (governing contested matters in bankruptcy but not incorporating Fed. R. Bankr. P. 7015, the Rule 15 analog in bankruptcy proceedings). The debtors did not object to the tardy supplement, nor did they raise the untimeliness issue in the district court or in their opening brief before this court.

The question for us is whether the deadline for UST motions to dismiss provided in section 704(b)(2) is jurisdictional in nature. There are two possibilities: (a) that the time limit for UST motions to dismiss is jurisdictional, such that untimeliness of the UST's section 707(b)(2) supplement deprived the bankruptcy court of jurisdiction to entertain those grounds for dismissal; or (b) that the time limit is not jurisdictional and the debtors waived their objection to the UST's late filing by failing to object. The UST claims that any objection to its untimely filing has been waived because section 704(b)(2)'s deadline for UST motions to dismiss is not jurisdictional. Statutory limits, it claims, are only jurisdictional when Congress "clearly states" that they are jurisdictional. The debtors

argue for the first time in their Reply Brief that "[i]f the motion under sec. 707(b)(2) were untimely, it resolves the appeal" because "[t]he lack of a timely objection should deprive the court of jurisdiction to entertain the motion to dismiss on that basis."

In *Bowles v. Russell*, ___ U.S. ___, 127 S. Ct. 2360 (2007), the Supreme Court held that the appellate filing deadline set by Fed. R. App. P. 4(a)(1)(A) and 28 U.S.C. § 2107(a) was jurisdictional in nature. The Court distinguished its holding in *Bowles* from that in *Kontrick v. Ryan*, 540 U.S. 443, 458-59 (2004), where the Court had held that Federal Rule of Bankruptcy Procedure 4004—which set deadlines for objections to a debtor's discharge—was not jurisdictional. In contrasting its holdings in *Bowles* and *Kontrick*, the Court emphasized that the non-statutory nature of the time limit in *Kontrick* was essential to the analysis in that case. *See Bowles*, 127 S.Ct. at 2364. Justice Thomas noted that "those decisions [which have undertaken to clarify the distinction between jurisdictional and non-jurisdictional rules] have . . . recognized the jurisdictional significance of the fact that a time limit is set forth in a statute." *Id*. This distinction made sense, the Court reasoned, because "Congress decides whether federal courts can hear cases at all, [and thus] it can also determine when, and under what conditions, federal courts can hear them." *Id*. at 2365.

*Bowles* suggests that where a filing deadline is set by statute, the time limit in question could be jurisdictional. *See Bowles*, 127 S. Ct. at 2364-65. However, we do not believe that the Supreme Court intended *Bowles* to apply

to every statutory deadline, especially in light of the fact that such an interpretation would overturn huge swaths of established case law. *See* Jason Binford, *Deadline Hard Line:* Bowles v. Russell *and the Special Significance of Statutory Deadlines*, 26-8 Am. Bankr. Inst. J. 22, 73 (2007). For example, most statutes of limitations are contained in statutes, but it is generally understood that a party can waive a statute of limitations defense by failing to raise it. The Supreme Court confirmed this point in *John R. Sand & Gravel Co. v. United States*, 128 S. Ct. 750 (2008). In that case, the Court stated that most limitations periods are non-jurisdictional affirmative defenses and are subject to waiver, forfeiture, and equitable tolling. *Id.* at 753 (citing, *inter alia*, *Rotella v. Wood*, 528 U.S. 549, 560 (2000) ("federal statutes of limitations are generally subject to equitable principles of tolling")). Specifically, the Court distinguished between the majority of statutes of limitations that "seek primarily to protect defendants against stale or unduly delayed claims," which are non-jurisdictional and subject to waiver, *see id.* (citing, *inter alia*, *United States v. Kubrick*, 444 U.S. 111, 117 (1979)), and statutes of limitations that seek to "achieve a broader system-related goal" such as "promoting judicial efficiency," which are "more absolute" and have been referred to as "jurisdictional," *see id.* (citing, *inter alia*, *Bowles*, 127 S.Ct. at 2365-66).

Thus, although *Bowles* implies that all statutory time limits may have jurisdictional significance, the Supreme Court's later discussion of statutes of limitations in *John R. Sand & Gravel Co.* appears to soften *Bowles*'s implications, at least for run-of-the-mill statutes of limitations and statutory time limits like the one at issue here. In this case,

although the section 704(b)(2) deadline for UST motions to dismiss has the salutary effect of promoting judicial efficiency, we believe that its primary purpose is to protect possibly cash-strapped debtors from needlessly protracted or delayed bankruptcy proceedings. Because section 704(b)(2)'s main purpose is to protect debtors, we believe that its protections, like those of the vast majority of statutory time limits, can be waived by the debtors as well.[3] *See John R. Sand & Gravel Co.*, 128 S.Ct. at 753. Because we hold that the section 704(b) deadline is not jurisdictional, the debtors have waived any objection to the UST's tardy supplemental filing raising the section 707(b)(2) grounds for dismissal. We thus proceed to the merits of this appeal.

---

[3] We note that our sister circuits have also not interpreted *Bowles* as transforming all federal statutory time limits into jurisdictional bars. For example, in interpreting the deadlines contained in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA")—which would seem to be more directed at promoting judicial efficiency and less at protecting litigants than the deadline here—circuit courts have consistently held that *Bowles* did not transform the relevant statutory time limits into jurisdictional bars. *See, e.g.*, *Coker v. Quarterman*, 270 Fed. Appx. 305, 2008 WL 724042, *5 n.1 (5th Cir. 2008) (expressly holding that equitable tolling of AEDPA's statute of limitations survives *Bowles*); *Diaz v. Kelly*, 515 F.3d 149, 153 (2d Cir. 2008) (same).

**C. Vehicle Ownership Deduction Under BAPCPA**

The only issue on the merits in this case is whether, in conducting their means test under section 707(b), the debtors may claim a vehicle ownership expense for a vehicle that is not encumbered by a debt or lease. We review this issue of statutory interpretation de novo. *See U.S. v. Thornton*, 539 F.3d 741, 745 (7th Cir. 2008); *see also In re Kimbro*, 389 B.R. 518, 520 (6th Cir. BAP 2008).

As noted above, the chapter 7 means test defines "monthly expenses" as follows:

> The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides. . . . Notwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts.

11 U.S.C. § 707(b)(2)(A)(ii)(I). The National and Local Standards referenced in the statute are found in the IRS's Financial Analysis Handbook which is, in turn, contained in the IRS's Internal Revenue Manual ("IRM").[4] Revenue agents use the IRM to assess the financial condition of delinquent taxpayers in order to determine how much they can afford to pay back to the government. The

---

[4] The IRM, including the Financial Analysis Handbook, can be found on the IRS website, at http://www.irs.gov/irm.

IRM specifies three types of expenses: National Standards, Local Standards, and Other Expenses. *See* IRM § 5.15.1.7. The IRM's Local Standards set out two categories of expenses: transportation and housing/utilities. There are two components of the transportation standard: a nationwide allowance for ownership costs and an allowance to cover the cost of operating one or two motor vehicles or the cost of public transportation. *See* IRM § 5.15.1.

In this case, the district court concluded that the debtors could not take the vehicle ownership deduction because they had no monthly car payment and so had no "applicable monthly expenses." The debtors argue that the district court erred in its interpretation because the statute specifically differentiates between "applicable" monthly expenses (which include the transportation ownership deduction) and "actual" monthly expenses. Under the debtors' reading, "applicable" expenses are those that apply to the debtors by virtue of their geographic region and number of cars, regardless of whether the debtor has an actual loan or lease payment.

This issue has been heavily litigated, and there is a close split among courts that have addressed it. *See In re Ransom*, 380 B.R. 799, 803-06 (9th Cir. BAP 2007) (describing the split in authority)[5]; *see also In re Ragle*, 395 B.R. 387, 392

---

[5] *Ransom* and several other cases used in our analysis deal with confirmation of a plan under chapter 13. These cases are instructive in chapter 7 cases because chapter 13 uses the means test of section 707(b)(2)(A)(ii)(I) to determine the debtor's

(continued...)

(E.D. Kent. 2008) (same). We note that of the four bankruptcy appellate panels that have addressed this question, two have concluded that a debtor who owns his car outright may take the deduction, *see In re Kimbro*, 389 B.R. 518, 532 (6th Cir. BAP 2008), *In re Pearson*, 390 B.R. 706, 714 (10th Cir. BAP 2008), and two have concluded the opposite, *see In re Ransom*, 380 B.R. 799, 808 (9th Cir. BAP 2007), *In re Wilson*, 383 B.R. 729, 734 (8th Cir. BAP 2008). The Seventh Circuit is the first circuit court to consider this issue.

In determining whether a debtor is entitled to take the ownership deduction, courts have generally taken two approaches. These approaches have generally been called the "IRM approach" and the "plain language" approach.[6] As explained below, we believe that the plain language approach—which allows the vehicle ownership deduction even where the debtors have no monthly car payment—is the better interpretation.

---

[5] (...continued)

projected disposable income. *See In re Sawicki*, No. 2-07-BK-3493-CGC, 2008 WL 410229 (Bankr. D. Ariz. Feb. 12, 2008).

[6] Because most courts have referred to the two sides of this debate in this manner, we use these labels for ease of analysis and recognition. However, courts which have differed from our present ruling should not be viewed as rejecting the "plain language" of the statute. Although we do not adopt it, the IRM view is supported by many thoughtful decisions, all of which believed that it was the proper interpretation of the statute. *See Pearson*, 390 B.R. at 714-15 (Thurman, B.J., concurring).

### 1. Statutory Language

To analyze this issue, we begin with the language of the statute. When the language is plain, the sole function of the courts is to enforce the statute according to its terms. *See Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004). The problem here is that courts are sharply divided on the proper interpretation of the statute. Courts following the IRM approach reason that the ownership deduction should not be taken if the debtor has no car payment because the word "applicable" means that the deduction may only be taken if the deduction is "relevant," that is, if the debtor has such an expense. *See, e.g. Wilson*, 383 B.R. at 732-33 . Courts adopting this approach believe that this reading gives "applicable" its customary meaning of "capable of being applied; having relevance" and thereby sufficiently distinguishes the term "applicable monthly expense amounts" from the term "actual monthly expenses in the statute." *See, e.g., Ransom*, 380 B.R. at 807 (citing MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 60 (11th ed. 2005)). Thus, under the IRM approach, if the debtor has no debt or lease payment on his vehicle, he cannot take the ownership deduction because it is not applicable to him.

However, courts in the plain language camp argue that "applicable" refers to the selection of an expense amount corresponding to the appropriate geographic region and number of vehicles owned by the debtor. *See, e.g., In re Grunert*, 353 B.R. 591, 592 (Bankr. E.D. Wis. 2007); *In re McIvor*, No. 06-42566, 2006 WL 3949172, *4 (Bankr. E.D. Mich. Nov. 15, 2006) ("the word 'applicable,' in the

context of 707(b)(2)(A)(ii)(I) means the applicable Local Standards as it pertains to the area in which the debtor resides"); *In re Smith*, No. 06-30261, 2007 WL 1836874, *8 (Bankr. N.D. Ohio June 22, 2007) ("If the debtor has only one car, the 'applicable' expense is the one found in the first column [of the Standard for Ownership Costs], and if a debtor has a second vehicle, the amount in the second column is also 'applicable.'"). In other words, under the plain language approach, the Local Standard vehicle ownership deduction "applies" to the debtor by virtue of his geographic region and number of cars, regardless of whether that deduction is an actual expenses.

We are persuaded that the plain language view of section 707(b)(2)(A)(ii)(I) is more strongly supported by the language and logic of the statute. In order to give effect to all the words of the statute, the term "applicable monthly expense amounts" cannot mean the same thing as "actual monthly expenses." Under the statute, a debtor's "actual monthly expenses" are only relevant with regard to the IRS's "Other Necessary Expenses;" they are not relevant to deductions taken under the Local Standards, including the transportation ownership deduction. Since "applicable" cannot be synonymous with "actual," applicable cannot reference what the debtor's actual expense is for a category, as courts favoring the IRM approach would interpret the word. We conclude that the better interpretation of "applicable" is that it references the selection of the debtor's geographic region and number of cars.

We also take note of two additional points in connection with the statutory language. First, as the Sixth Circuit

BAP pointed out in *Kimbro*, section 707(b)(2)(A)(ii)(I) additionally states that "[n]otwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts." It is difficult to square this part of section 707(b)(2)(A)(ii)(I) with the IRM approach, which would only allow the vehicle ownership deduction on condition of a monthly debt payment. *See Kimbro*, 389 B.R. at 523 ("This provision alone establishes beyond doubt that Congress intended to allow an ownership expense even when a debtor has no debt payment on a vehicle."). Second, when we examine the means test more broadly, we find that Congress has been fairly specific in describing the circumstances under which deductions are to be taken. For example, section 707(b)(2)(A)(ii) uses the following phrases to describe the nature of various other deductions: "debtor's reasonably necessary expenses incurred," § 707(b)(2)(A)(ii)(I) (Family Violence Prevention and Services Act expenses); "expenses paid by the debtor that are reasonable and necessary," § 707(b)(2)(A)(ii)(II) (expenses for elderly, chronically ill or disabled immediate family members); "reasonable and necessary [expenses]," § 707(b)(2)(A)(ii)(I) (additional allowances for food and clothing up to 5%); and "actual expenses [that are] are reasonable and necessary," § 707(b)(2)(A)(ii)(V) (additional home energy costs). The language of these provisions shows that when Congress intended to condition a deduction on a debtor's actual expenditure or showing of need, it did so. The absence of this type of language with regard to the Local Standards—again, the statute only refers to the "debtor's applicable monthly expense amounts specified

under the National Standards and Local Standards"—suggests that courts should not require more of
the debtor than to show that the "amount specified" under
the Local Standard be applicable by virtue of the debtor's
geography and number of vehicles.

### 2. Incorporation of IRM Analysis

The IRM approach is characterized as such because
courts following it use the methodology of the IRM as an
interpretive guide for the means test. Decisions favoring
the IRM view generally reason that we should look not
only to the Local Standards themselves (which are
simply dollar amounts) in conducting a debtor's means
test, but also to the manner in which the IRM uses the
Local Standards in the revenue collection process. *See*, *e.g.*,
*Ransom*, 380 B.R. at 805-06.

IRS agents use the Local Standards as caps on what a
delinquent taxpayer may claim as living expenses when
calculating what the taxpayer can pay back to the government. *See* IRM § 5.15.1.7 (stating, regarding the local
standards, that "[t]axpayers will be allowed the local
standard or the amount actually paid, whichever is less")
(emphasis in original). Under IRS methodology, if a
taxpayer has no car payment, the taxpayer is entitled only
to the transportation operation deduction, not the ownership deduction. *See id.* ("If a taxpayer has a car, but no car
payment [sic] only the operating cost portion of the
transportation standard is used to figure the allowable
transportation expense."). As the Ninth Circuit BAP
explained in *Ransom*: because the IRS Manual "prohibits

the debtor from asserting the vehicle ownership expense deduction when he or she has no loan or lease payments on a vehicle, [courts taking the IRM approach] reason that § 707(b)(2)(A)(ii)(I) does not allow such a deduction either." *Ransom*, 380 B.R. at 806.

However, while the IRM provides a useful methodology to IRS agents for determining a taxpayer's ability to pay the IRS, we agree with other plain language courts that there is no indication that Congress intended that methodology to be used in conducting the means test. As an initial matter, section 707(b)(2)(A)(ii)(I) makes reference only to the "amounts specified" in the Local Standards; the statute does not incorporate the IRM or the Financial Analysis Handbook, or even refer to them. *See* 11 U.S.C. § 707(b)(2)(A)(ii)(I) (making no reference to the IRM, the Financial Analysis Handbook or their methodologies). The legislative history of section 707(b)(2)(A)(ii)(I) confirms that the provision's silence with regard to the IRM and IRS methodology was deliberate. A prior version of a bill can be useful in interpreting a bill that was subsequently enacted. *See, e.g., In re Lifschultz Fast Freight Corp.*, 63 F.3d 621, 631 (7th Cir. 1995) (the fact that the final enacted version of a bill omitted a provision contained in earlier unpassed versions of the bill evidenced a "significant and clearly deliberate" choice by Congress). A prior version of the BAPCPA which was never passed defined "projected monthly net income" under the means test to require a calculation of expenses as follows:

> (A) the expense allowances under the applicable National Standards, Local Standards, and Other

Necessary Expenses allowance (excluding payments
for debts) for the debtor . . . in the area in which the
debtor resides *as determined under the Internal Revenue
Service financial analysis* for expenses in effect as of
the date of the order for relief.

H.R. 3150, 105th Congress (1998) (emphasis added). The
phrase "as determined under the Internal Revenue Service
financial analysis" was later removed and replaced by
the current language, which states that the debtor
should deduct the "applicable monthly expense amounts
specified under the National and Local Standards." 11
U.S.C. § 707(b)(2)(A)(ii)(I). This change indicates Con-
gress's intent that courts not be bound by the financial
analysis contained in the IRM and supports the conclu-
sion that courts should look only to the numeric
amounts set forth in the Local Standards. *See Kimbro*, 389
B.R. at 526; *In re Fowler*, 349 B.R. 414, 419 (Bankr. D. Del.
2006). Because the statute incorporates only the "amounts"
of the Local Standards and does not incorporate IRM
procedures or methodology, and because the legislative
history of the statute indicates that Congress inten-
tionally omitted any reference to IRM financial analysis,
we believe that using IRM methodology in conducting
the means test is misguided. *See In re Simms*, No. 06-1206,
2008 WL 217174, *18 (Bankr. N.D.W.V. Jan. 23, 2008) ("No
basis exists for the court to allow the National or Local
Standards to be spliced based on what an IRS field agent
would do when dealing with a delinquent taxpayer.").

In addition to the fact that neither the statutory text
nor history support using IRM methods in the means test,

there are also practical reasons why it is inappropriate to look to the IRM, namely that the substantial discretion allowed to a revenue officer under the IRM is inconsistent with the purpose of the means test to adopt a uniform, bright-line test that eliminates judicial discretion. As explained in *Kimbro*:

> Congress intended that there be uniform and readily-applied formula for determining when the bankruptcy court should presume that a debtor's chapter 7 petition is an abuse and for determining an above-median debtor's disposable income in chapter 13. By explicitly referring to the National and Local Standards, Congress incorporated a table of standard expenses that could be easily and uniformly applied; Congress intended that the court and parties simply utilize the expense amount from the applicable column based on the debtor's income, family size, number of cars and locale. The amounts are entered into the means test form and a determination of disposable income is accomplished without judicial discretion. The clear policies behind the means test were the uniform application of a bright-line test that eliminates judicial discretion. Plainly, Congress determined that these policies were more important than accuracy.

> However, if the IRM were used to determine the amounts of expenses . . . the means test would of necessity again be a highly discretionary test, because under the IRM, a revenue officer is afforded significant discretion in determining a taxpayer's ability to pay a tax debt.

*Kimbro*, 389 B.R. at 527-28. If courts were to interpret section 707(b)(2)(A)(ii)(I) as incorporating the highly discretionary procedures revenue officers use under the IRM, the means test would be similar to the disposable income determination used before BAPCPA, when bankruptcy judges had a great deal of discretion in determining a debtor's net disposable income. *See id.* at 530. It was clearly Congress's intent to eliminate such discretion when it enacted BAPCPA. *See In re Spraggins*, 386 B.R. 221, 223-25 (Bankr. E.D. Wis. 2008) (stating that it was "Congressional intent to employ a bright-line test for disposable income by removing bankruptcy court 'value judgments' concerning the debtor's lifestyle"); *In re Pearl*, 394 B.R. 309, 314 (Bankr. N.D.N.Y. 2008) (Congress's intent was to was to "eliminate the discretion of the courts in determining what expenses are reasonable"). We thus are further convinced that it is inappropriate to look to the IRM for guidance in applying the means test.

In sum, because we believe that reference to IRM methodology is inconsistent with the statutory language, history, and purpose, we do not turn to it in interpreting the means test.

### 3. Policy

We also believe that policy considerations support allowing the ownership deduction to debtors who own their cars outright. It is common sense that there are costs associated with vehicle ownership apart from loan or lease payments. (And of course, in some sense, debt payments are not really "ownership costs" at all.) These

non-debt costs include depreciation, insurance, licensing fees and taxes. *See Kimbro*, 389 B.R. at 531 (reasoning that "every vehicle owner incurs ownership expenses, and that is so regardless of debt or lease payments"). We see no reason why these expenditures are not contemplated by the ownership deduction. It is true that non-debt ownership expenses may be sporadic or—aside from replacement costs—substantially less than the ownership deduction amounts (which in this case are $471 for the first car and $332 for the second car). However, monthly car payments can be comparatively small as well. *See, e.g.*, *In re Clark*, No. 07-23390, 2008 WL 444565, *6 (Bankr. E.D. Wis. Feb. 14, 2008) (noting, in considering this issue, that one of the debtor's car payments was only $79.17). The *Clark* court posited a possible explanation: it reasoned that "Congress must have had a reason for allowing the ownership deduction in calculating the means test formula for debtors with modest [car] payments, perhaps as some courts have posited, because the debtors may need replacement transportation during the course of [bankruptcy proceedings]." Debtors who own their cars outright would have the same potential need for vehicle replacement, so we believe that they are similarly entitled to the deduction even though the deduction amount may exceed their actual costs. *See id.*; *see also* Eugene Wedoff, *Means Testing in the New 707(b)*, 79 Am. Bankr. L.J. 231, 257 (2005) (recognizing that allowing the ownership deduction to debtors who own their cars outright "reflects the reality that a car for which the debtor no longer makes payments may soon need to be replaced (so that the debtor will have actual ownership expenses) . . . .").

Limiting the deduction to debtors who make car payments would also produce arbitrary and unfair results. The debtor who completes his last car payment just before filing would not be allowed the deduction, while the debtor who has one car payment remaining a few days after filing would be allowed to take it. As Bankruptcy Judge Eugene Wedoff commented in his article exploring the BAPCPA means test: Allowing the ownership deduction to debtors who own their vehicles outright "avoids arbitrary distinctions between debtors who have only a few car payments left at the time of their bankruptcy filing and those who finished making their car payments just before the filing." Wedoff, 79 Am. Bankr. L.J. at 258. We also think it unfair to "punish" debtors who choose to drive older or cheaper vehicles that they own rather than borrow money to obtain newer or more expensive cars, especially in light of the fact that one of BAPCPA's purposes was to make it more difficult to discharge consumer debts.

Finally, we acknowledge that courts following the IRM approach believe that our reading is inconsistent with one of the main purposes of BAPCPA: that "creditors [] be repaid when possible." *See, e.g., Ransom*, 380 B.R. at 808; *In re Howell*, 366 B.R. 153, 157 (Bankr. D. Kan. 2007) ("[D]enying debtors the ownership allowance when they have no ownership expense (i.e. loan or lease payments) is entirely consistent with one of the apparent objectives of BAPCPA: to ensure that debtors actually pay what they are capable of paying to unsecured creditors."). While we agree that the repayment of creditors is among the purposes of BAPCPA, our concern on this front is lessened

considerably because our decision to allow the ownership deduction to a debtor who owns his car outright does not necessarily mean that the debtor's case will not be dismissed. *See Ragle*, 395 B.R. at 399 (citing *In re Zaporski*, 366 B.R. 758, 768 (Bankr. E.D. Mich. 2007)). Permitting a debtor to take the deduction—even where that deduction puts the debtor's current monthly income below the presumptive abuse threshold—does not insulate his case from dismissal. Instead, it simply means that the debtor's petition is not *presumed* abusive. *See Fowler*, 329 B.R. at 421. The UST can still request dismissal, as he has done in this case, under section 707(b)(3), either for bad faith or based on the totality of circumstances (which can take into consideration a debtor's actual income and expenses). *See Zaporski*, 366 B.R. at 768.

### III. Conclusion

For the reasons explained above, we hold that a debtor who owns his car free and clear may take the Local Standard transportation ownership deduction under the section 707(b)(2)(A)(ii)(I) means test. Accordingly, we REVERSE the district court and REMAND for further proceedings. We instruct the district court to consider the alternative argument briefed below by the UST, that the totality of the circumstances of the debtors' financial situation demonstrate abuse under section 707(b)(3)(B).