# United States Court of Appeals

## For the First Circuit

No. 08-9007

IN RE GLEN H. RUDLER,

Debtor.

_____

PHOEBE MORSE, United States Trustee,

Appellant,

v.

GLEN H. RUDLER,

Appellee.

APPEAL FROM THE BANKRUPTCY APPELLATE PANEL
OF THE FIRST CIRCUIT

Before
Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

Teal Luthy Miller, with whom Phoebe Morse, United States Trustee for the Districts of Maine, Massachusetts, New Hampshire and Rhode Island; Ramona D. Elliott and P. Matthew Sutko, Executive Office for United States Trustees, U.S. Department of Justice; Geraldine Karonis and Ann Marie Dirsa, Office of the United States Trustee, District of New Hampshire; Gregory G. Katsas, Assistant Attorney General; and William Kanter, Attorney, Appellate Staff, Civil Division, were on brief, for appellant.

Scott W. LaPointe, with whom Brown & LaPointe, P.A. was on brief, for appellee.

August 5, 2009

**LIPEZ, <u>Circuit Judge</u>**.  This bankruptcy appeal requires us to resolve a question of statutory construction that has divided bankruptcy courts and has not yet been addressed by any other circuit: whether the means test for identifying an abusive Chapter 7 petition allows a debtor to deduct from his income the installment payments due for property he plans to surrender in the bankruptcy.  <u>See</u> 11 U.S.C. § 707(b)(2).  Both the bankruptcy court and the Bankruptcy Appellate Panel ("BAP") held that such a deduction is permitted because, at the time the disposable income calculation is performed, such payments remain – in the words of the statute – "scheduled as contractually due."  We agree, and therefore affirm.

**I.**

**A.  Applicable Law**

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") was enacted in response to an upward trend in consumer bankruptcy filings and concerns that bankruptcy relief was "too readily available" and "sometimes used as a first resort, rather than a last resort."  H.R. Rep. No. 109-31(I), at 4 (2005), <u>reprinted in</u> 2005 U.S.C.C.A.N. 88, 90.  Of particular concern was the pursuit of Chapter 7 liquidations instead of Chapter 13 debt repayment plans by consumer debtors who could afford to repay some of their debts.  <u>See</u> 151 Cong. Rec. S2459, 2468-70 (daily ed. Mar.

10, 2005) (Statement of Sen. Hatch); In re Hardacre, 338 B.R. 718, 720 (Bankr. N.D. Tex. 2006) (citing 151 Cong. Rec. at 2469-70).[1]

The BAPCA was designed to lessen the resort to Chapter 7 filings by, among other measures, amending section 707(b) of the Bankruptcy Code to relax the standard for dismissing a Chapter 7 case as abusive. See, e.g., In re King, No. 08-41975, 2009 WL 62252, at *3 (Bankr. E.D. Tex. Jan. 6, 2009). Previously, a showing of "substantial abuse" was required, and "[t]here was a presumption in favor of granting the relief sought by the debtor." Id. As amended by the BAPCA, section 707(b) drops the qualifying word "substantial," permitting a bankruptcy court to dismiss a Chapter 7 proceeding brought by an individual debtor who has mostly consumer debts "if [the court] finds that the granting of relief would be an abuse." 11 U.S.C. § 707(b)(1). In order to "ensure that debtors repay creditors the maximum they can afford," the BAPCPA established a mathematical formula, known as a "means test," by which some Chapter 7 cases are deemed presumptively abusive. See H.R. Rep. No. 109-31(I), at 1, reprinted in 2005 U.S.C.C.A.N. at 89 (describing the "income/expense screening mechanism" as "[t]he heart of the bill's consumer bankruptcy reforms"); 11 U.S.C.

---

[1] Chapter 13 debtors commit their projected disposable income to repaying creditors and receive a less comprehensive discharge of their debts than would be granted under Chapter 7. See Marrama v. Citizens Bank of Mass. (In re Marrama), 430 F.3d 474, 481 (1st Cir. 2005) (contrasting "chapter 7 debt-liquidation cases" with "the less debtor-friendly, debt restructuring chapter 13 regime"); see also 11 U.S.C. §§ 1325(b)(1), (b)(4)(A)(ii)(I).

§ 707(b)(1), (2); see also Ross-Tousey v. Neary (In re Ross-Tousey), 549 F.3d 1148, 1151 (7th Cir. 2008) ("The purpose of the means test is to distinguish between debtors who can repay a portion of their debts and debtors who cannot.").[2]

Only those debtors whose monthly income exceeds the state median for their family size are subject to means testing. 11 U.S.C. § 707(b)(7). The formula calculates the debtor's average monthly disposable income, over a sixty-month period,[3] by deducting statutorily prescribed expenses from current monthly income. See id. at § 702(b)(2)(A)(ii)-(iv). If the resulting income figure exceeds a threshold amount specified in the statute – $167 per month at the time relevant here – the bankruptcy case is presumptively abusive. 11 U.S.C. § 707(b)(2)(A)(i).[4] Upon motion by the United States Trustee, the bankruptcy court may either

_____

[2] Abuse also may be shown under subsection (b)(3)(B) based on the totality of the debtor's financial circumstances. See 11 U.S.C. § 707(b)(3). Only the means test is at issue here.

[3] The five-year time period "corresponds to the maximum term of a case under Chapter 13 of the Bankruptcy Code." In re Randle, 358 B.R. 360, 361 (Bankr. N.D. Ill. 2006), aff'd, Randle v. Neary (In re Randle), No. 07 C 631, 2007 WL 2668727 (N.D. Ill. Jul. 20, 2007).

[4] The debtor is given the opportunity to rebut the presumption of abuse by showing that "special circumstances," such as a serious medical condition or active duty military service, justify an income adjustment or additional expenses. 11 U.S.C. § 707(b)(2)(B)(i). The possibility of special circumstances has not been raised in this case.

-4-

dismiss such a case or, with the debtor's consent, convert it into a Chapter 13 proceeding.  11 U.S.C. § 707(b)(1).

The deductible expenses under the means test include standard living expenses prescribed by the Internal Revenue Service, see, e.g., id. at § 707(b)(2)(A)(ii)(I); certain "reasonably necessary" actual expenses (such as for health and disability insurance), id.; and other actual expenses up to a maximum allowable deduction (for example, expenses for the education of a minor child "not to exceed" $1650 per year), id. at § 707(b)(2)(A)(ii)(IV).  At issue here is the allowable deduction "on account of secured debts," such as mortgage or car payments. Id. at § 707(b)(2)(A)(iii)(I).  The critical language describes the deductible amount of such debts to be "the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition," divided by

60.  Id.[5]  The resulting amount is the debtor's average monthly expense for secured debt.

Debtors submit their calculations under the means test on Form B22A ("Chapter 7 Statement of Current Monthly Income and Means-Test Calculation"), one of the documents a debtor must file with a Chapter 7 bankruptcy petition.  See 11 U.S.C. § 707(b)(2)(C); Fed. R. Bankr. P. 1007(b)(4).[6]  Debtors also must

---

[5] Section 707(b)(2)(A)(iii) states in full:

(iii) The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—

(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and

(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;

divided by 60.

[6] Form B22A is a six-page form that asks the debtor to calculate, inter alia, his current monthly income and the total deductions allowed under section 707(b)(2).  Subpart C of the Deductions section inquires about future payments on secured debts and states, in relevant part:

Future payments on secured claims.  For each of your debts that is secured by an interest in property that you own, list the name of [the] creditor, identify the property securing the debt, and state the Average Monthly Payment.  The Average Monthly Payment is the total of all amounts contractually due to each Secured Creditor in the 60 months following the filing of the bankruptcy case, divided by 60.  Mortgage debts should include payments of taxes and insurance required by the mortgage.

file "a schedule of current income and current expenditures," known as Schedules I and J, respectively, and a Statement of Intention that discloses plans to retain or surrender the properties that are securing the debts listed on a separate schedule of assets and liabilities.   See 11 U.S.C. § 521(a)(1)(B)(ii); id. at § 521(a)(2)(A); Fed. R. Bankr. P. 1007(b)(1), (2).

The type of dispute that underlies this case arises when a debtor announces an intention to surrender certain property – here, a house that secures two mortgages – but includes future mortgage payments in calculating the amount of secured debt to be deducted from monthly income on Form B22A.  Given that the property will be surrendered and the mortgage will no longer be paid, the question is whether such payments are "scheduled as contractually due . . . in each month of the 60 months following the date of the petition."

## B. Factual Background

Appellee Glen H. Rudler filed a Chapter 7 bankruptcy petition in August 2006.  Since his monthly income at the time of the filing exceeded the applicable state median for his family size, Rudler was subject to the means test to determine if his

Part VI of the form, labeled "Determination of § 707(b)(2) Presumption," asks the debtor to subtract his total of allowable deductions from his calculation of "Current monthly income for § 707(b)(2)."  After completing that "means test" calculation, the debtor is directed to check the appropriate box on the front of the form indicating whether the presumption of abuse does, or does not, arise.

bankruptcy case should be categorized as presumptively abusive. In a Statement of Intention, Rudler reported that he intended to surrender his home, which was secured by two mortgages with a combined monthly payment of approximately $4,000. Despite his plans to give up the house, Rudler deducted the $4,000 in mortgage payments when calculating his monthly disposable income on Form B22A. That calculation produced a monthly disposable income of negative $2,376, avoiding the presumption of abuse.

If Rudler were unable to deduct the mortgages, he instead could claim a statutorily prescribed housing allowance of $1,439.[7] In that event, his monthly disposable income under the formula would be $1,461, far in excess of the $167 monthly amount that triggers the presumption of abuse.[8] Based on these figures, the United States Trustee moved under section 707(b)(1) to dismiss Rudler's Chapter 7 case as abusive, arguing that Rudler should not have included the mortgage debt in his calculation of secured debt because he intended to surrender the property and, consequently, would not be making payments on the mortgages.

---

[7] Rudler actually deducted both the housing allowance and his mortgage debt, which is clearly impermissible. Accordingly, his disposable income amount needs to be revised regardless of the treatment of his mortgage debt.

[8] This calculation, which is undisputed by the parties, reflects a $162 deduction for Chapter 13 administrative expenses, which would be allowed as an offset if Rudler were required to file under Chapter 13 rather than Chapter 7.

The bankruptcy court denied the motion to dismiss, concluding that Rudler was entitled to deduct the mortgage payments under the means test notwithstanding his intention to surrender the property. The Trustee appealed the decision to the Bankruptcy Appellate Panel ("BAP") for the First Circuit, which affirmed. The BAP held that the means test calculation is meant to be "a 'snap-shot' of the debtor's situation as of the petition date," rather than a "'forward-looking'" consideration of "only those payments that will <u>actually</u> be made." <u>In re Rudler</u>, 388 B.R. 433, 438 (B.A.P. 1st Cir. 2008). On appeal to this court, the Trustee reiterates her contention that section 707(b)(2) does not permit a debtor to deduct payments on debts secured by property the debtor intends to surrender.

## II.

We briefly address the threshold issue of whether we have jurisdiction to review the BAP's decision. Circuit courts have jurisdiction over "all final decisions, judgments, orders, and decrees" issued by a bankruptcy appellate panel on appeal from a bankruptcy court. 28 U.S.C. § 158(d)(1). To be final, "a bankruptcy order need not resolve all of the issues in the proceeding, but it must finally dispose of all the issues pertaining to a discrete dispute within the larger proceeding." <u>Perry</u> v. <u>First Citizens Fed. Credit Union</u> (<u>In re Perry</u>), 391 F.3d 282, 285 (1st Cir. 2004). "'Finality' is given a flexible

-9-

interpretation in bankruptcy" because "bankruptcy cases typically involve numerous controversies bearing only a slight relationship to each other." In re Northwood Props., LLC, 509 F.3d 15, 21 (1st Cir. 2007) (quotation marks and citation omitted); see also Ross-Tousey, 549 F.3d at 1152 ("Finality does not require the termination of the entire bankruptcy proceeding; rather, an adjudication by the bankruptcy court 'is definitive because it cannot be affected by the resolution of any other issue in the proceeding, and therefore no purpose would be served by postponing the appeal to the proceeding's conclusion.'") (quoting In re Oakley, 344 F.3d 709, 711 (7th Cir. 2003)).

Four circuits, addressing an earlier version of section 707(b), have characterized orders on motions to dismiss for abuse as final. See Ross-Tousey, 549 F.3d at 1153; In re Cortez, 457 F.3d 448, 453-54 (5th Cir. 2006); Stuart v. Koch (In re Koch), 109 F.3d 1285, 1288 (8th Cir. 1997); Matter of Christian, 804 F.2d 46, 47-48 (3d Cir. 1986).[9] We also are persuaded that, at least where

---

[9] The Eighth and Third Circuits explicitly held that orders denying trustee motions to dismiss are sufficiently final to permit review by the court of appeals, while the Seventh and Fifth Circuit cases involved appeals of district court reversals of bankruptcy courts' denials of such a motion (i.e., district court judgments that would result in conversion to Chapter 13 or dismissals for abuse). In Ross-Tousey, however, the Seventh Circuit additionally characterized the bankruptcy court's denial of the motion to dismiss as final because that "decision resolved all of the contested issues on the merits and left only the [ministerial act of] distribution of estate assets to be completed." 549 F.3d at 1153.

the dispute at issue turns on a question of law, it is appropriate to treat such orders as final under the amended version of section 707(b)(2).  But see Barben v. Donovan (In re Donovan), 532 F.3d 1134, 1137 (11th Cir. 2008) (holding that an order denying a motion to dismiss a Chapter 7 case for substantial abuse, under the earlier version of section 707(b), was not appealable).[10]

This case involves only the purely legal question of whether secured debts may be deducted under section 707(b) if the secured property will be surrendered as part of the bankruptcy proceedings.  Further development of the case will shed no new light on that issue.  Delaying consideration of the question, however, may frustrate both principles of judicial economy and Congress's goal of ensuring that debtors allocate as much of their resources as possible toward repaying their debts.  See Koch, 109 F.3d at 1288 ("Requiring trustees to complete Chapter 7 proceedings before appealing denial of their § 707(b) motions wastes debtor resources that should be used to pay creditors, and forces trustees and bankruptcy courts to expend their scarce institutional resources on abusive Chapter 7 petitioners."); see also id. (noting that, if such an order cannot be appealed, "bankruptcy proceedings

---

[10] The Eleventh Circuit in Donovan concluded that a bankruptcy court's order denying a motion to dismiss, which was affirmed by the district court, was not final because the court's action "did not conclusively resolve the bankruptcy case as a whole, nor did the court resolve any adversary proceeding or claim."  532 F.3d at 1137.

must 'be completed before it can be determined whether they were proper in the first place.'" (quoting Christian, 804 F.2d at 48)).

Moreover, motions to dismiss for abuse under section 707(b) are subject to statutory deadlines, presumably foreclosing renewed requests for dismissal as the Chapter 7 case proceeds.[11] Thus, from a pragmatic standpoint, the "discrete dispute" over a debtor's abuse of Chapter 7 will be finally resolved when a court denies a motion to dismiss under section 707(b) and, consequently, an immediate appeal of the ruling will not interfere with further action on the issue by the lower courts.

We therefore proceed to address the deductibility of secured debts on property that will be surrendered. Our review is de novo. Marrama, 430 F.3d at 477 (holding that, on an appeal from

---

[11] Under section 704(b)(2), the United States trustee's motion to dismiss must be made within thirty days from the time the trustee files an initial statement on whether the case is presumed abusive, see 11 U.S.C. § 704(b)(1)(A), and the initial statement must be submitted within ten days of the meeting of the creditors. Id. The creditors' meeting ordinarily must be held "no fewer than 20 and no more than 40 days" after the date of a voluntary Chapter 7 petition. See Fed. R. Bankr. P. 2003 (specifying that twenty-day period, but allowing the trustee to set a later date "if there is a motion to dismiss the case"); 11 U.S.C. § 301(b). Similarly, Bankruptcy Rule 1017(e)(1), which applies to "any party in interest" as well as the trustee, see 11 U.S.C. § 707(b)(1), provides that a motion to dismiss for abuse may be filed "only within 60 days after the first date set for the meeting of creditors," unless the bankruptcy court extends that period for cause. Fed. R. Bankr. P. 1017(e)(1). These various provisions ensure that motions under section 707(b) are made early in the bankruptcy case and mean that, as here, the issue of abuse will be finally resolved by the bankruptcy court's order on those motions.

a BAP decision, the appeals court reviews the bankruptcy court's legal rulings de novo).

## III.

In arguing her view of section 707(b)(2)(A)(iii)(I), the Trustee relies heavily on Congress's purpose in enacting the BAPCPA, i.e., to ensure that individuals who are able to repay a portion of their debts do so. However, we must defer our consideration of Congressional intent because our examination of the statute must begin "where all such inquiries must begin: with the language of the statute itself." United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989); Stornawaye Fin. Corp. v. Hill (In re Hill), 562 F.3d 29, 32 (1st Cir. 2009). If the statute's language is plain, "'the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.'" Lamie v. United States, 540 U.S. 526, 534 (2004) (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000)); Ron Pair, 489 U.S. at 242. We thus look first to the specific language at issue, which defines deductible secured debt as amounts that are "scheduled as contractually due to secured creditors in each of the 60 months following the date of the petition." Unless that language is ambiguous, we consider Congress's intent only to be certain that the statute's plain meaning does not lead to "absurd" results. Lamie, 540 U.S. at 534.

## A. Statutory Language

Although the precedent runs both ways, the vast majority of bankruptcy courts to consider the issue have concluded that the plain language of section 707(b)(2) permits a Chapter 7 debtor to deduct payments on a secured debt even when the debtor plans to surrender the collateral underlying that debt. See, e.g., In re Norwood-Hill, 403 B.R. 905, 910 (Bankr. M.D. Fla. 2009); In re Crawley, No. 08-14419-SSM, 2009 WL 902359, at *3 (Bankr. E.D. Va. Feb. 23, 2009); In re Hayes, 376 B.R. 55, 63 (Bankr. D. Mass. 2007); In re Hartwick, 359 B.R. 16, 19-20 (Bankr. D.N.H. 2007); Randle, 358 B.R. at 363-64; In re Sorrell, 359 B.R. 167, 186 (Bankr. S.D. Ohio 2007); In re Haar, 360 B.R. 759, 766-67 (Bankr. N.D. Ohio 2007); In re Chang, No. 07-50484-ASW, 2007 WL 3034679, at *3 (Bankr. N.D. Cal. Oct. 16, 2007); In re Walker, No. 05-15010-WHD, 2006 WL 1314125, at *4 (Bankr. N.D. Ga. May 1, 2006). But see, e.g., In re Naut, No. 07-20280REF, 2008 WL 191297, at *8 (Bankr. E.D. Pa. Jan. 22, 2008); In re Harris, 353 B.R. 304, 309-310 (Bankr. E.D. Okla. 2006); In re Skaggs, 349 B.R. 594, 599-600 (Bankr. E.D. Mo. 2006).[12] The courts have focused in particular on

_____

[12] We do not address here the construction of section 707(b)(2)(A)(iii)(I) in the context of a Chapter 7 case. See Norwood-Hill, 403 B.R. at 910 (explaining that "a distinct analysis" of the provision must be undertaken in Chapter 7 and 13 cases because "there are different considerations with respect to how issues arising under these respective chapters are handled"); see also 11 U.S.C. § 1325(b)(3) (referencing section 707(b)(2) for the calculation of disposable income for above-median debtors in a Chapter 13 case). Thus, the Seventh Circuit's recent decision

two aspects of the text: the significance of the phrase "scheduled as contractually due" and the forward-looking nature of the reference to the period "<u>following</u> the date of the petition." <u>See</u>, <u>e.g.</u>, <u>Hayes</u>, 376 B.R. at 61-64; <u>Haar</u>, 360 B.R. at 764-66.

The Trustee asserts that, read in combination, the two phrases call for a projection of the <u>actual</u> payments the debtor will make on secured debts after the bankruptcy proceedings have ended. She emphasizes that, in many cases, nothing remains "contractually due" after a debtor surrenders the collateral securing a debt and points out that, even if a deficiency payment is owed, "the remaining liability is not 'contractually due to [a] <u>secured</u> creditor,' as required by the statute." We turn to an evaluation of these arguments.

1. "Scheduled as Contractually Due"

At the time a debtor files a bankruptcy petition and completes Form B22A, which includes the means test calculation and the inquiry about secured debts that are "scheduled as contractually due," <u>see</u> <u>supra</u> note 6, the debtor will not yet have given up any secured property identified for surrender in his or her Statement of Intention. Thus, even if the debtor plans to surrender a house on which he is paying a mortgage, he will at that

_____

briefly discussing the provision's language in the context of a Chapter 13 proceeding, <u>see</u> <u>In re Turner</u>, No. 08-2163, 2009 WL 2136867 (7th Cir. Jul. 20, 2009), which was called to our attention by counsel for the Trustee, is not directly applicable here.

point still have "contractually due" payments that are "scheduled" to be paid during the upcoming months. This is so whether or not the debtor has already defaulted on the mortgage by failing to make such payments in previous months because the fact of default does not release him from the ongoing obligation. See Randle, 358 B.R. at 365 ("[T]he debtor must fill out Form B22A as of the petition date, and on that date her mortgage payments were 'due' under the contract whether the debtor planned to make them in the future or not.").

The instructions on Form B22A confirm that the debtor is expected to provide current information for all secured debt. It identifies the "Future payments on secured claims" that must be listed on Line 42, pursuant to section 707(b)(2)(A)(iii), as follows:

> For each of your debts that is secured by an interest in property that you own, list the name of [the] creditor, identify the property securing the debt, and state the Average Monthly Payment. The Average Monthly Payment is the total of all amounts contractually due to each Secured Creditor in the 60 months following the filing of the bankruptcy case, divided by 60.

(Emphasis added.) The form, like the statute itself, asks in the present tense for a list of debts secured by property. The list is not limited to debts on property the debtor plans to retain, nor does it exclude debts that recently have gone unpaid. The statutory provision is stated comprehensively, asking for the total

-16-

of all payments scheduled during the five-year period, without reference to whether other documents filed in connection with the bankruptcy show that the payments are likely to stop during that period. See, e.g., Hartwick, 359 B.R. at 19; Randle, 358 B.R. at 363.[13] In sum, any debt that "is secured" is covered by the statute's inquiry.

The Trustee argues that "reading the phrase 'scheduled as contractually due' to include all current contractual obligations fails to give independent meaning to the words 'scheduled as.'" If that is what Congress meant, she asserts, it could simply have defined the relevant payments as those "contractually due . . . following the date of the petition." To give effect to the separate term "scheduled as," she maintains that the statute must be read as asking for a forward-looking assessment of whether the payments actually will be made.

_____

[13] The court in Randle emphatically observed:

Here, the plain language of § 707(b)(2)(A)(iii) says that the debtor "shall" deduct the amounts "scheduled as contractually due in each month of the 60 months following the date of the petition." It does not say that the debtor can deduct this amount only if she intends to keep the collateral post-petition. It does not say that the debtor can deduct this amount only if she intends to continue making the payments due post-petition. And it does not refer to the debtor's Statement of Intention with respect to the collateral. The provision requires the court to consider only the amounts due under the contract itself.

358 B.R. at 362-63.

-17-

The word "scheduled," however, does not connote the confirmation of payments to be made that the Trustee ascribes to it. Indeed, it implies the contrary recognition that such payments, although "scheduled," may in fact not be made; otherwise, the request would more logically have been for information about all payments that will be made to creditors during the targeted sixty-month period, or all payments the debtor expects or intends to make during that time frame. See Walker, 2006 WL 1314125, at *4 (noting that the word "scheduled" "implies the possibility that the payments may not be made as required under the contract"). As other courts have observed, if Congress had sought to exclude secured debt on properties the debtor has stated an intention to surrender, "it could easily have said so." Randle, 358 B.R. at 363; see also, e.g., Hartwick, 359 B.R. at 19; Walker, 2006 WL 1314125, at *4 (noting that "Congress could have specified that the payments to be deducted are only those payments to be made on secured debts that the debtor intends to reaffirm"). Congress's "choice of language shows a clear intent not to impose any such limit on debtors." Randle, 358 B.R. at 363.

The Trustee points out fairly that, under this interpretation, the term "scheduled as" appears to play no role in defining the payments covered by section 707(b)(2)(A)(iii)(I). The same result would be achieved by referring only to payments that were, at the time of the bankruptcy filing, "contractually due."

-18-

Still, we fail to see how that apparent surplusage warrants limiting the words "scheduled as" – which are stated in the present tense – to only those payments that will be made in the future. See Lamie, 540 U.S. at 536 ("Surplusage does not always produce ambiguity and our preference for avoiding surplusage constructions is not absolute."). Although our construction of the statutory language cannot turn on the language of Form B22A – the official document on which debtors must report their means test calculations – we think it worth noting that the phrase "scheduled as" is omitted from the form's instructions for calculating secured debt. See supra note 6 & p. 17. The absence of that language may reflect a recognition by those tasked with creating the document that the term adds nothing to the inquiry.

The Trustee alternatively argues that "scheduled as" must be construed in the specific context of the Bankruptcy Code, where the word "schedule" and the phrase "scheduled as" are used as terms of art. This argument invokes a debate in the cases that address section 707(b)(2)(A)(iii)(I) between "two main interpretive camps" – one concluding that the word "scheduled" refers to a debt being listed on the debtor's formal bankruptcy "schedules," and the other adopting "the common, dictionary-defined meaning of 'scheduled' as 'planned for a certain date.'" Hayes, 376 B.R. at 61; see also Haar, 360 B.R. at 764-65; Skaggs, 349 B.R. at 599. The Trustee argues here that the Code refers to claims or debts

-19-

being "scheduled as" due if the debt is properly listed on a debtor's bankruptcy schedules, and she asserts that "scheduled as contractually due" should thus be limited to those contractual obligations "properly listed on a bankruptcy schedule because the debtor intends to honor them."

The primary problem with this argument, as recognized in Hayes and other cases cited therein, see 376 B.R. at 62, is that section 707(b)(2)(A)(iii)(I) does not refer directly to any bankruptcy schedules, and there is no schedule that asks a debtor to identify obligations that are "contractually due" at the time of the petition, but that may be resolved through surrender of the collateral. See id.; see also Sorrell, 359 B.R. at 185 ("[A] debtor's statement of intention is not a schedule."); Randle, 358 B.R. at 365; In re Nockerts, 357 B.R. 497, 502 (Bankr. E.D. Wis. 2006) (noting that, when describing the bankruptcy schedules, Congress "include[s] in the statute a reference to the schedules, either directly by name or indirectly by reference to § 521, the provision that requires the debtor to file bankruptcy schedules"). Moreover, to the extent that appearance on a "schedule" is a prerequisite for including a debt in the means test calculation, Schedule J, which lists the debtor's expenses as of the petition date, could be expected – as in this case – to include any mortgage payments due at that time, without regard for the debtor's future intentions with respect to the underlying property. See Randle,

-20-

358 B.R. at 365 (noting that Schedule J "normally includes mortgage and car payments due" at the time the bankruptcy petition is filed).[14]

In addition, the Code uses the word "scheduled" in two places in the dictionary-definition sense to refer to "scheduled payments," making an ordinary construction of the term a possibility in this context as well. See Hayes, 376 B.R. at 61-62 (citing, as an example, 11 U.S.C. § 1326(a)(1)(B), which provides that a debtor "shall make pre-confirmation payments 'scheduled in a lease of personal property directly to the lessor'"). Hence, the Code's other uses of "scheduled" or "scheduled as" fail to illuminate the meaning of the term here, giving us no reason to

---

[14] In Naut, however, the court relied on the fact that the debtor had not included the disputed mortgage debt on his Schedule J, concluding that "debts must be included on a debtor's Schedule J to be deducted from income through the means test." 2008 WL 191297, at *8. We need not address whether listing a debt on Schedule J is a statutory prerequisite for the deduction. Rudler's mortgage debts were listed on both Schedule D ("Creditors Holding Secured Claims") and Schedule J ("Current Expenditures of Individual Debtor").

In another variation, the court in In re Singletary, 354 B.R. 455, 467 (Bankr. S.D. Tex. 2006), concluded that "scheduled" refers to a debt being listed on the debtors' official schedules, but rejected the Trustee's argument that declaring an intent to surrender collateral was enough to make the debt no longer scheduled for purposes of section 707(b)(2)(A)(iii)(I). The court instead held that debts were "scheduled as contractually due" unless, by the time a motion to dismiss for abuse was filed, the debtor already had surrendered the collateral, id. at 469-70, triggering an obligation to amend the debtors' schedules to reflect the change, id. at 467.

depart from the provision's plain meaning, i.e., that the debtor may deduct all payments owed at the time of the bankruptcy filing.

The "scheduled as" language may not be construed in isolation, however, <u>Hayes</u>, 376 B.R. at 63, and we therefore consider whether the other critical statutory language points to a different outcome.

2. "[F]ollowing the date of the petition"

The Trustee argues that Congress, in using the word "following," contemplated a projection of future expenses – i.e., expenses that will exist "following" the bankruptcy proceedings – rather than a snapshot of current expenses. Again, however, that interpretation is not supported by the words themselves, which are forward-looking only in the sense that the required <u>current</u> calculation is for debts that are scheduled into the future. <u>See</u> <u>Hayes</u>, 376 B.R. at 63 (noting that the provision is "'forward-looking' in the sense that it takes into account payments" required in the future, but that "it is clear from the plain language of the provision that this determination is to be made at the <u>time the petition is filed</u>"); <u>Haar</u>, 360 B.R. at 766. The Trustee attempts to change this plain meaning by analogy, asserting that other deductions allowed by the means test are forward-looking and that the deduction for secured debts should be treated consistently with the treatment of such other expenses.

-22-

As the Trustee acknowledges, however, the statute sets allowable expenses by means of several different methods, and, "[l]ike section 707(b)(2)(A)(iii), many other provisions of the means test appear to operate contrary to the goal of accurately determining the amount of income that would actually be available for payments to unsecured creditors in a Chapter 13 case." Walker, 2006 WL 1314125, at *6. For example, the starting point for the means test, current monthly income, is calculated as the average income earned by the debtor in the six months preceding the bankruptcy filing. See 11 U.S.C. § 101(10A)(A); Crawley, 2009 WL 902359, at *4; Walker, 2006 WL 1314125, at *5. By the time of the filing, the amount of actual income could be dramatically different from the previous six-month average – for example, if the debtor has just lost his job or secured a new one. See Hayes, 376 B.R. at 65; Walker, 2006 WL 1314123, at *5.

Even on the expense side of the calculation, the means test relies on standard deduction amounts for certain types of expenses that may be "either significantly less than or greatly in excess of the debtor's actual expenses." Walker, 2006 WL 1314123, at *7; see also Hayes, 376 B.R. at 65; Randle, 358 B.R. at 364. For example, the IRS has prescribed standard amounts to be used in the means test calculation, instead of the individual debtor's actual costs, for certain categories of expenses (food, housekeeping supplies, and transportation). See 11 U.S.C. §

-23-

707(b)(2)(A)(ii)(I); Eugene R. Wedoff, <u>Means Testing in the New</u> <u>§ 707(B)</u>, 79 Am. Bankr. L.J. 231, 251-261 (2005). Thus, the future inaccuracy of the snapshot-in-time approach to the expense for secured debt does not help the Trustee's argument. <u>See</u> <u>Hayes</u>, 376 B.R. at 65 ("It cannot be fairly said, therefore, that Congress was overly-concerned with capturing an accurate, precise financial picture to determine whether the case would be presumed abusive."); <u>Randle</u>, 358 B.R. at 364 ("Congress adopted a test for the presumption of abuse that relies primarily on standardized estimates of expenses, not the debtor's actual expenses."); <u>Walker</u>, 2006 WL 1314125, at *6 ("[M]any other provisions of the means test appear to operate contrary to the goal of accurately determining the amount of income that would actually be available for payments to unsecured creditors . . . .").

3. "[O]n account of secured debt"

The Trustee also invokes a third phrase from section 707(b)(2)(A) in support of her position, arguing that the requirement that payments be made "on account of secured debts" excludes debts that will remain after the property serving as collateral for them has been surrendered. She reasons that, after title has transferred following surrender, the debtor's obligation either will be eliminated entirely or changed into an unsecured debt – meaning that any future payments will not be "on account of <u>secured</u> debts." The Trustee asserts that the transformation of

-24-

such debts is "relevant to the debtor's monthly expenses, and thus relevant to whether granting the debtor a chapter 7 discharge would be an abuse." Indeed, she points out, the purpose of surrendering collateral is to reduce monthly living expenses. See Harris, 353 B.R. at 309; In re Love, 350 B.R. 611, 614-15 (Bankr. M.D. Ala. 2006).

Other courts have closely examined the impact of a debtor's surrender of property and whether the original contractual obligation remains even after the debtor has defaulted on a loan. See, e.g., Randle, 358 B.R. at 362-63; see also Rudler, 388 B.R. at 438 ("[T]hose amounts remain contractually due, regardless of whether said payments will actually be made, whether the debtor will reaffirm the debt, or whether the debtor will surrender the property to the secured party."); Walker, 2006 WL 1314125, at *4, *7. In our view, this issue is largely beside the point. The pertinent question is not the debtor's status vis-a-vis the loan after it is renounced, but whether the means test calculation is to be performed coincident with the bankruptcy filing, based on then-current information. As we have explained, the statute as written plainly requires such a pre-surrender calculation.

Our conclusion that the language of the statute is unambiguous allows us to consider Congressional intent only if literal application of the statute would lead to absurd results. Lamie, 540 U.S. at 534; see also Ron Pair, 489 U.S. at 242

-25-

(describing the inquiry as whether "literal application . . . will produce a result demonstrably at odds with the intentions of its drafters") (quotation marks and citation omitted). That exception is not triggered here. As we shall explain, a "snapshot" approach to the deduction for secured debts fits rationally within the statutory scheme.

**B. Congressional Intent**

The Trustee argues that allowing debtors to deduct only payments they will actually make, rather than all payments scheduled at the time of the bankruptcy filing, better serves the purpose behind the means test because it more accurately reflects the debtor's resources following the bankruptcy proceedings. This argument has force – but it misses the point. There are a number of ways Congress could have effectuated its goal of increased debtor responsibility, and calculating projected income based on actual anticipated expenses is unquestionably one of them. However, based on the plain language of the statute, that is not the approach Congress enacted into law, and we cannot rewrite the statute simply because we think a different method of assessing abuse would be more effective.

A test that relies on a snapshot of the debtors' circumstances at the time of the bankruptcy filing is not an "absurd" alternative. To the contrary, a fixed approach to the secured debt deduction makes sense because the actual amount the

debtor will pay on secured debts in the relevant sixty-month period is subject to a number of variables:

> [A] debtor might state an intention to reaffirm but the creditor might refuse to agree, preferring to take the collateral back because of the debtor's bad payment history. Or the debtor might be able to reaffirm the debt at a more favorable interest rate or lower monthly payment. Or the debtor might state an intention to redeem but later be unable to obtain redemption financing.

Randle, 358 B.R. at 364; see also Haar, 360 B.R. at 767; Walker, 2006 WL 1314125, at *4 (noting that, after filing the statement of intention, the debtor may decide to amend it and to reaffirm the debt or redeem the property). Although Congress could have chosen to give bankruptcy judges the discretion to address such uncertainties on a case-by-case basis, there is nothing absurd about Congress's choice to adopt a rigid formula.

A number of courts have in fact concluded that a specific intent to limit the bankruptcy court's discretion underlies the means test and accounts for Congress's adoption of a "'mechanical formula' for presuming abuse of Chapter 7." Randle, 358 B.R. at 363 (citing Report of the Committee on the Judiciary, House of Representatives, to Accompany S. 256, H.R. Rep. No. 109-31, pt. 1, at 553, 109th Cong., 1st Sess. (2005) ("[T]he formula remains inflexible and divorced from the debtor's actual circumstances." (dissenting views))); see also Hayes, 376 B.R. at 65 (noting that "the intent of Congress in creating the specific mechanics of the

means test under § 707(b)(2) appears more to have been a plan to reduce judicial discretion on the question of whether a particular case is presumed 'abusive'"); Hartwick, 359 B.R. at 21 ("The major objective of Congress in adding the means test in § 707(b)(2) was to limit judicial discretion from the process of determining abuse by providing an objective standard for establishing a presumption of abuse."); In re Barr, 341 B.R. 181, 185 (Bankr. M.D.N.C. 2006) ("[I]t appears that Congress intended to adopt a specific test to be rigidly applied rather than a standard to be applied according to the facts and circumstances of the case."); Walker, 2006 WL 1314125, at *6 ("The means test is . . . a mechanical estimate of the debtor's abilities to fund a Chapter 13 plan and was not intended to be a perfect indicator of ability to pay.").

Indeed, choosing the certainty of a mechanical approach over an "actual circumstances" evaluation under section 707(b)(2) complements the totality-of-the-circumstances inquiry prescribed by section 707(b)(3)(B), which remains a backup option when the Trustee is dissatisfied by the results of the means test. See, e.g., Rudler, 388 B.R. at 439; Hartwick, 359 B.R. at 21; id. at 20 ("Under the totality of the circumstances test, courts may take into account both current and foreseeable circumstances, including a debtor's ability to repay his debts under a chapter 13 plan."); Singletary, 354 B.R. at 465 ("To allow a movant to include the outcome of future events as part of the means test would eliminate

-28-

the distinction between the presumption of abuse test and the totality of the circumstances test."). If a review of all of a debtor's bankruptcy documents shows that the means test is too generous, a finding of abuse may be appropriate under that subsection. Norwood-Hill, 403 B.R. at 911 ("[A] determination that the presumption of abuse does not arise pursuant to the means test[] does not close the door on conversion or dismissal."); Crawley, 2009 WL 902359, at *5 ("The fact that the debtors 'pass' the means test does not, however, end the inquiry. . . . [T]he case may nevertheless be dismissed as an abuse if 'the totality of the circumstances . . . demonstrates abuse.'" (quoting 11 U.S.C. § 707(b)(3))); Hartwick, 359 B.R. at 21-22; see also Singletary, 354 B.R. at 465.

The court in Walker also observed that the BAPCPA's goals extend beyond increasing debtors' accountability for their debts. Still part of the Code is the longstanding objective to "provid[e] honest debtors with a fresh start, as well as encouraging financially responsible behavior and rehabilitation." 2006 WL 1314125, at *7; see also Susan Jensen, A Legislative History of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 79 Am. Bankr. L.J. 485, 566-67 (2005) (quoting President Bush's remarks upon signing the Act, stating that bankruptcy laws "give those who cannot pay their debts a fresh start" and that the new law will require those with ability to "pay back at least a portion

of their debts"). If section 707(b)(2)(A)(iii)(I) were interpreted as the Trustee urges – excluding debts on property that will be surrendered – debtors might be inclined to unwisely reaffirm such debts to avoid triggering the presumption of abuse. Walker, 2006 WL 1314125, at *8. Although other provisions of the Code may defeat such a strategy, see, e.g., 11 U.S.C. § 524(m) (giving the court authority to disapprove reaffirmation agreements), the possibility of manipulation – and the other uncertainties, noted above, surrounding the decision to reaffirm or surrender – further support a plain-language reading of the secured-debt deduction. A calculation that is more generous to the debtor, but has the advantage of certainty, is not inevitably at odds with Congress's intent.[15]

## IV.

We thus conclude that, in calculating monthly income under the means test, the plain language of section 707(b)(2)(A)(iii)(I) allows debtors to deduct payments due on a secured debt notwithstanding the debtor's intention to surrender the collateral. That plain language is consistent with other provisions that rely on standardized estimates of expenses rather than the debtor's actual circumstances. The mechanical approach avoids the uncertainties that surround a debtor's announced, but

---

[15] Indeed, the policy considerations emphasized in the concurrence reinforce this outcome.

not yet executed, plan to surrender property or reaffirm secured debts.  Hence, allowing the deduction does not produce an "absurd" result and the plain language of section 707(b)(2)(A)(iii)(I) must govern.

Accordingly, the judgment of the bankruptcy court is affirmed.

So ordered.

**– Concurring Opinion Follows –**

**LYNCH, <u>Chief Judge</u>, concurring in the judgment.** I join the judgment of the court affirming the bankruptcy court's application of the means test.

The underlying problem concerns whether a bankruptcy petition filed under chapter 7 should be converted to a chapter 13 petition (with the debtor's consent), or be dismissed, because it is abusive. <u>See</u> 11 U.S.C. § 707(b)(1). Chapter 7, which discharges the debtor's debts, is more favorable to the debtor than chapter 13, which commits the debtor's projected disposable income toward paying his creditors.

In the structure of the bankruptcy act, Congress provided two different mechanisms for determining whether a chapter 7 petition is abusive. The first test, which presumes abuse if the debtor's monthly income as calculated under the statute exceeds a certain threshold -- here, $167 per month -- is the means test under 11 U.S.C. § 707(b)(2)(A)(i). The second test allows the court to consider whether the petition was filed in bad faith and whether the "totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." <u>Id.</u> § 707(b)(3). Here, the trustee argued that the chapter 7 petition was presumptively abusive under the means test; she did not seek a finding of abuse under the totality of the circumstances test.

The question before us is the meaning of the statutory phrase "scheduled as contractually due," <u>id.</u>

-31-

§ 707(b)(2)(A)(iii)(I), as it applies to collateral which the debtor intends to surrender at the time he files his schedules and statement of intentions. Although the language of the statute tends to support the debtor's position, I do not think the plain text resolves the issue one way or the other. The word "scheduled," even standing alone, is ambiguous. If Congress had wanted to include all future payments regardless of the debtor's intentions to make those payments, it could have used explicit language to that effect. Conversely, if only those debts the debtor intends to repay were meant to be counted, Congress could have used language to that effect, including by referencing the debtor's statement of intentions in the statute.

The textual ambiguity is not resolved by the rule of construction that no statutory term should be read to be surplusage or unnecessary. The trustee's surplusage argument does not compel adoption of her view. The term "scheduled as" is certainly not surplusage under the trustee's reading because the term indicates where a court should look to determine whether a particular debt should be counted under the means test. Likewise, the term "scheduled as" is not necessarily surplusage under the debtor's reading, which uses the term colloquially.

Nor is the interpretive issue resolved, for several reasons, by the fact that the means test uses rough approximations of _certain_ inputs into the calculation, such as the debtor's

current monthly income or expenses for food, housekeeping supplies, and transportation.  This does not tell us whether a similar approximation should be made for the debtor's future payments on certain secured debts.  For example, a debtor's future income may be hard to predict for various reasons, making an approximation based upon the debtor's recent income history the most accurate and convenient indicator of the debtor's future income from the information available to the bankruptcy court.  But the same accuracy and convenience factors that justify a rough approximation of income are not present for the debtor's future payments to secured creditors, especially because the analysis could easily be refined by looking to the debtor's statement of intentions to determine whether he plans to surrender the collateral securing a particular debt.  Moreover, the fact that the means test allows the debtor to use standard deduction amounts for some expenses, such as expenses for food, housekeeping supplies, and transportation, see id. § 707(b)(2)(A)(ii)(I), does not mean that other inputs into the means test should disregard the debtor's actual expenses.  Indeed, other inputs into the means test, such as the debtor's expenses in caring for a family member, include only the debtor's actual expenses paid.  See id. § 707(b)(2)(A)(ii)(II).

All that one can conclude with certainty is that Congress, after balancing the occasionally competing concerns of accuracy and convenience, intended some inputs into the means test

to be generalized approximations and others to be derived more closely from the debtor's actual financial situation. Because Congress's treatment of the other inputs may well have been driven by policy considerations unique to those factors, one cannot draw a conclusion about how Congress intended to account for a debtor's future payments to secured creditors from the ways in which Congress treated those other inputs.

The combination of the text, the structure of the statute, and considerations of administrative ease of enforcement, to my mind, provides more guidance. See Pierce v. Underwood, 487 U.S. 552, 558-60 (1988) (reviewing the language, structure, and practical considerations to determine the meaning of the statutory phrase "substantially justified"); In re Hannaford Bros. Co. Customer Data Sec. Breach Litig., 564 F.3d 75, 79 n.6 (1st Cir. 2009) (rejecting an interpretation of a statute where, in addition to the direction of the plain text, the proposed reading would have created "serious administrability problems"); Stonawaye Fin. Corp. v. Hill (In re Hill), 562 F.3d 29, 34-35 (1st Cir. 2009) (using the "language, structure, and evident purpose" to understand the meaning of the bankruptcy act). The means test -- if applied without regard to the debtor's intentions -- becomes more complementary to the totality of the circumstances test, which requires more of an inquiry into a number of facts. That is, Congress may have designed the means test as an efficient way to

weed out those for whom a quick look at their filing reveals an ability to repay their creditors, making treatment of their petitions under chapter 13 more appropriate. At the same time, Congress may have intended the totality of the circumstances test to function as a backstop to catch those whose petitions are not presumptively abusive under the means test but for whom a closer look at their actual financial situation shows that they have the means to repay their creditors under chapter 13 and that they have tried to avoid that repayment.

Moreover, this view of the means test has certain advantages. The means test as described by the debtor may be easier to administer than the alternative proposed by the trustee because it requires no consideration of the debtor's intentions. Whatever the loss in accuracy which results under this view of the means test (usually favoring the debtor), that accuracy may be recaptured or approximated under the alternative totality of the circumstances test.

It is not clear that Congress focused on the problem of how to treat secured debts under the means test where the debtor intends to surrender the collateral. If Congress had focused on this precise problem, it may well have adopted a different solution. But until Congress gives us a clearer indication of its intentions, it best fits the structure of the statute to use the means test as a quick screening test to identify those who should

-35-

not proceed under chapter 7, reserving the totality of the circumstances test for a more thorough consideration of the debtor's financial situation. From the structure of the statute, the general tendency of the language to support the debtor's position, and the ease of administration of the means test as described by the debtor, I conclude that Congress's intention was that courts apply the means test without regard for the debtor's intentions, even though many of the other interpretative guides are inconclusive. Nothing in the legislative history leads to a different conclusion.

I join the judgment of the court.